UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
MING SHU JIN,

                    Plaintiff,               **FINDINGS OF FACT AND**
                - v -                      **CONCLUSIONS OF LAW**

PACIFIC BUFFET HOUSE, INC. and EUN          CV-06-579 (VVP)
SOOK AHN,
                    Defendants.
------------------------------------------------------------------x
POHORELSKY, Magistrate Judge:

Having considered the evidence at trial and the submissions of the parties, the court

makes the following findings of fact and reaches the following conclusions of law:

## FINDINGS OF FACT

1.      The defendant Pacific Buffet House, Inc. is a now-defunct corporation that

formerly operated a restaurant known as "Seaworld" in Elmhurst, Queens.  In 2001, apparently

because of allegations of trademark infringement, the name of the restaurant changed to "Pacific

World."  *See* Tr. 449;[1] Def. Ex. I.  (Seaworld and Pacific World are collectively referred to

herein as the "restaurant.")

2.      The defendant Eun Sook Ahn was employed at the restaurant and had substantial

authority over the operations of the restaurant throughout the period of time from August 2000 to

at least March 2003.  She made decisions concerning the hiring of employees and the wages they

were to be paid.  She directed the activities of the various managers at the restaurant, and made

decisions about when and whether the plaintiff was to be paid.  At least as early as March 2001,

the defendant Ahn also had signature authority on the restaurant's checking account, and in

November or December of 2001 became President of Pacific Buffet House, Inc.  Pl. Ex. 6.

---

[1]"Tr." refers to the transcript of the trial; citations to the transcript are in the form "page:line
number[s]."  "Def. Ex." and "Pl. Ex." refer to the defendants' and the plaintiff's exhibits at trial.

3.      The plaintiff Ming Shu Jin, a native of China who immigrated to the United States in 1995, was employed as a waitress at the restaurant from August 2000 to February 23, 2003. During her employment there, she went by the name "Sunny Han," and held a bank account under the name "Ping Wan." At trial she testified under the name "Myoung Suk Kim."

4.      At the time that the plaintiff commenced her employment at the restaurant in 2000, the business was owned by three persons – the defendant Ahn's former husband, named Lee, and two other partners. The defendant's former husband owned 40% of the business and the other two each had 30% shares.

5.      In early 2001, litigation between the defendant Ahn and her former husband led to the appointment of a receiver to oversee the financial aspects of the operation of the restaurant. The receiver was in place for the period from approximately March to November of 2001.

6.      While the receiver was in place, the defendant Ahn had authority to operate the business, including the authority to hire and fire employees, but had to obtain approval from the receiver with respect to significant decisions involving financial matters. The defendant Ahn's husband was not allowed on the premises.

7.      In December 2001, after the receivership had been dissolved, the defendant Ahn assumed her former husband's 40% share of the business and became President of Pacific Buffet House, Inc. She remained in that role from December 2001 to at least May 2003.

8.      The plaintiff was hired to work at the restaurant by the defendant Ahn, who knew her through the plaintiff's previous employment at another restaurant operated by the defendant Ahn. Ms. Ahn sought out and enlisted the plaintiff to come to the restaurant to work as a

waitress. She made the decision to hire the plaintiff and set the terms and conditions of her employment, including the amount of her wages.

9. When the plaintiff commenced employment in August 2000 she was paid wages at the rate of $4.50 per hour. In or about February 2001, her wages were lowered to $3.00 per hour for approximately three weeks, and then raised to $5.00 per hour. The rate remained at $5.00 per hour until her employment ended on February 23, 2003. The plaintiff's wages were paid in cash, amounting to $225 per week when she was earning $4.50 per hour and then $250 per week when she was earning $5.00 per hour. Tr. 68.

10. At various times during her employment, the plaintiff was not paid her weekly wages. By November of 2002, her unpaid back wages amounted to approximately one year of wages. After she complained, payment of her wages on a weekly basis resumed for a period of time, and she also began receiving extra payments, some in cash and some by checks, to make up for past unpaid wages. See Pl. Ex. 4A, 4B. With the extra payments the arrearage was reduced to six months. Payment of the plaintiff's weekly wages ceased again in January and February of 2003, however, and the plaintiff the estimates that by the time her employment at the restaurant terminated on February 23, 2003, the arrearage for unpaid wages stood at approximately eight months.

11. Beginning in February 2002, the defendants withheld $23 from the plaintiff's weekly pay as a "tip tax," presumably to satisfy withholding tax requirements with respect to tip income received by the plaintiff. There is no evidence, however, that any such withholding taxes were ever paid over to the Internal Revenue Service with respect to the plaintiff, or any other employees.

12.     The plaintiff typically worked five days per week, with Mondays and Wednesdays off.  On weekdays, the plaintiff worked from 3:00 p.m. to between 10:30 and 11:00 p.m.  On weekends, the plaintiff began working between 10:00 and 10:15 a.m., and completed her work between 11:30 p.m. and midnight.  When there were parties on the weekends, however, she could work as late as 1:00 to 2:00 a.m.  Parties occurred approximately five times per month.  Toward the end of 2002, the plaintiff's Sunday workday changed, commencing at 2:00 p.m. rather than in the morning.  Thus, the court finds that in an average workweek prior to December 2002 the plaintiff would work a total of 52 hours, including parties, and that from December 2002 until her employment ended her average work week totaled 48 hours.

13.     The plaintiff's testimony about her work hours was corroborated by the testimony of a co-worker, In Hong Lee, who was also employed as a waiter at the restaurant for a portion of the time that the plaintiff was employed there.

14.     The restaurant required the employees to keep track of their hours by means of time cards that the employees used to "punch in" and "punch out" of work each day.  No time cards were produced by the defendants either in discovery or at the trial, nor did the defendants produce any other records relating to actual hours worked and wages paid.

15.     Although the defendant Ahn and her daughter offered testimony different from that offered by the plaintiff concerning hours and wages, their testimony lacked detail and they differed from one another concerning the numbers of hours the plaintiff worked and the rates at which she was paid.

16.     Throughout the time that the plaintiff worked at the restaurant, she received income from her employment in the form of tips in addition to the wages she was paid.  The

defendant Aun estimates that the plaintiff earned at least $60 per day in tips, and between $300

to $500 per week if parties were included. Tr. 434:13-16. The court credits this testimony.

First, it was unrebutted. Moreover, as set forth above, the plaintiff went many weeks without

being paid any wages whatsoever to the point where her unpaid wages were one year in arrears

by approximately November 2002. No employee in that position would have continued to work

without receiving compensation sufficient to justify remaining in the employment. Such

compensation necessarily would have come from the tips she was receiving.

17. The plaintiff filed this action on February 8, 2006 asserting claims for unpaid

minimum wages under the Fair Labor Standards Act of 1938 (the "FLSA"), 29 U.S.C. §§ 201-

219, and under various provisions of New York law including the New York Labor Law.

18. The defendant Ahn admitted that she was aware of the requirements of law

concerning the payment of minimum wages and overtime wages. Tr. 25:4-9; 430:13-18. The

defendant Ahn insisted that she paid wages to the plaintiff that were equal to or exceeded the

minimum wage of $5.15 per hour. Tr. 433:19 to 434:8; 480:13-17; 573:23 to 575:3. In addition,

the required Labor Department poster concerning wages and hours was posted in the restaurant.

Tr. 227:5-23.

### CONCLUSIONS OF LAW

1. This court has subject matter jurisdiction over the FLSA claims pursuant to 28

U.S.C. § 1331. The claims arising under New York law are so related to the FLSA claims that

they form part of the same case or controversy, and are therefore within the supplemental

jurisdiction of the court pursuant to 28 U.S.C. § 1367.

2.      Both the FLSA and New York law define the term "employer" broadly for

purposes of determining those who bear liability for unpaid wages. *Chan v. Sung Yue Tung

Corp.*, No. 03 Civ. 6048, 2007 WL 313483, at *12 (S.D.N.Y. Feb. 1, 2007); *see* 29 U.S.C. §

203(d) (defining "employer" to include "any person acting directly or indirectly in the interest of

an employer in relation to an employee"); N.Y. Lab. Law §§ 2(6), 651(6), 190(3); *see also Falk*

*v. Brennan*, 414 U .S. 190, 195 (1973) (emphasizing "expansiveness" of the definition of

employer under the FLSA).  In making a determination whether someone is an "employer" under

the FLSA, "the overarching concern is whether the alleged employer possessed the power to

control the workers in question, with an eye to the 'economic reality' presented by the facts of

each case." *Herman v. RSR Sec. Svcs. Ltd.*, 172 F.3d 132, 139 (2d Cir.1999).  The factors to be

considered include "whether the alleged employer (1) had the power to hire and fire the

employees, (2) supervised and controlled employee work schedules or conditions of

employment, (3) determined the rate and method of payment, and (4) maintained employment

records." *Carter v. Dutchess Cmty. Coll.*, 735 F.2d 8, 12 (2d Cir.1984).  Given the defendant

Ahn's operational control of the restaurant, including her decisionmaking authority with respect

to the hiring of employees and the payment of their wages, the defendant Ahn meets the

definition of employer under the FLSA.  As the breadth of the definition of "employer" under

state law is similar to that under the FLSA, *see, e.g., Chan*, 2007 WL 313483, at *12 (*citing*

*Moon v. Kwon*, 248 F. Supp. 2d 201, 236 (S.D.N.Y.2002)), the defendant Ahn is an "employer"

under state law as well.

3.      The FLSA requires employers to pay their employees a minimum hourly wage.

During the period of time when the plaintiff was employed as a waitress at the restaurant, the

prevailing minimum wage was $5.15 per hour. 29 U.S.C. § 206, as amended by the Minimum Wage Increase Act of 1996, Pub. L. No. 104-188, 110 Stat. 1928. During the same period of time, New York law similarly required the payment of a minimum hourly wage in the amount of $5.15 per hour. N.Y. Labor Law § 652(1).

4.      With respect to tipped employees, the FLSA permits the employer to take a "tip credit" which effectively reduces the amount the employer must pay to meet the minimum wage requirements of the FLSA. *See* 29 U.S.C. § 203(m). To qualify for the tip credit, however, the employer must satisfy two conditions: (1) inform the employee of the "tip credit" provision of the FLSA, and (2) permit the employee to retain all of the tips the employee receives. E.g., *Chan v. Sung Yue Tung Corp.*, No. 03 Civ. 6048, 2007 WL 313483, at *17 (S.D.N.Y. Feb. 1, 2007); *Chung v. New Silver Palace Restaurant, Inc.*, 246 F. Supp. 2d 220, 228-29 (S.D.N.Y. 2002). As there is no evidence whatsoever that the defendants informed the plaintiff of the "tip credit" provision, the defendants are not entitled to take a tip credit toward the payment of the minimum wage required by the FLSA.

5.      New York law also permits employers in the restaurant industry to obtain credit for tips received by food service workers, which the law defines to include "any employee who . . . is primarily engaged in the serving of food or beverages to guests, patrons or customers in the hotel or restaurant industries . . . and who regularly receive [sic] tips from such guests, patrons or customers." N.Y. Comp. Codes R. & Regs. tit. 12, § 137-1.4. For a food service worker, the employer must pay "a cash wage of at least $3.30 per hour, provided that the tips of such worker, when added to such cash wage, are equal to or exceed $5.15 per hour." *Id.*, § 137-1.5. The

plaintiff was a food service worker within the meaning of this provision throughout her employment at the restaurant.

6.     The defendants are entitled to the tip credit afforded by New York law because the plaintiff's cash wage was $4.50 per hour, well in excess of the $3.30 per hour minimum prescribed above, and the plaintiff received tips averaging at least $60 per day, resulting in a total wage well exceeding the $5.15 per hour minimum wage.  The plaintiff argues that the defendants are not entitled to the New York "tip credit" because they did not comply with the recordkeeping requirements set out in N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.5.  Those recordkeeping requirements, however, do not apply to food service workers in the restaurant industry.  The provisions of the section cited by the plaintiffs apply to industries whose employees are not covered by a specific minimum wage order promulgated by the New York Commissioner of Labor.  N.Y. Comp. Codes R. & Regs. tit. 12, § 142-1.1.[2]  The restaurant industry is covered by a separate, specific minimum wage order, *see* N.Y. Comp. Codes R. & Regs. tit. 12, §§ 137-1.1 to 137-3.13, which does not include a recordkeeping requirement comparable to the one cited by the plaintiff.

7.     The FLSA also requires employers to pay their employees at the rate of at least one and one-half times their regular rate of pay for each hour above forty hours that an employee works in a given workweek.  *See* 29 U.S.C. § 207.  New York law similarly requires the payment of wages at one and one-half times the regular rate of pay for each hour above forty hours

---

[2]Section 142-1.1 reads, in pertinent part,

This Part shall apply to all employees, as such term is defined in this Part, except:

(a) employees who are covered by minimum wag standards in any other minimum wage order promulgated by the commissioner.

worked in a given week.  N.Y. Comp. Codes R. & Regs. tit. 12, § 137-1.3.  In addition, separate

from any other regular or overtime wages, when an employee works more than 10 hours on any

given day, the employee is entitled to receive an additional one-hour's pay at the applicable

minimum wage rate.  N.Y. Comp. Codes R. & Regs. tit. 12, § 137-1.7.  This wage entitlement is

commonly referred to as "spread of hours."

8.      Under the FLSA, the statute of limitations applicable to claims for unpaid wages

is two years, but is extended to three years if the violation is willful.  29 U.S.C. § 255(a).  A

violation is willful, within the meaning of the FLSA, if "the employer either knew or showed

reckless disregard for the matter of whether its conduct was prohibited by the statute."

*McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988).  Conversely, an employer's

conduct is not willful if the employer acts reasonably in determining its legal obligations.  Nor is

the conduct willful even if the employer acts unreasonably, so long as it is not reckless.  *Id.*, 486

U.S. at 135 n.13; *accord Kaur v. Royal Arcadia Palace, Inc.*, No. 05-CV-4725, 2007 WL

4591250, at *14 (E.D.N.Y. Dec. 27, 2007).  Because the defendant Ahn was aware of the

requirements of law concerning the payment of minimum and overtime wages, any failure to pay

the required wages must be considered willful and therefore would entitle the plaintiff to the

benefit of the three-year statute of limitations prescribed by the FLSA.  As this action was filed

on February 8, 2006, the plaintiff may recover under the FLSA for unpaid minimum and

overtime wages earned on and after February 8, 2006.

9.      Under New York law, the statute of limitations for claims for unpaid wages is six

years, which entitles her to recover under New York law for unpaid minimum and overtime

wages earned on and after February 8, 2000.  N.Y. Lab. Law §§ 198(3), 663(3).

10.     Federal law requires employers to "make, keep, and preserve" records concerning

the "wages, hours, and other conditions and practices of employment" that they maintain, and

authorizes the Department of Labor to issue regulations to enforce these requirements.  *See* 29

U.S.C. § 211.  Under those regulations, employers are required to maintain payroll records for at

least three years, and basic timekeeping and earnings records for at least two years.  29 C.F.R. §§

516.5(a), 516.6(a).  New York law likewise requires employers to keep and maintain detailed

payroll records relating to their employees, and such records must be preserved for at least six

years.  N.Y. Comp. Codes R. & Regs. tit. 12, § 137-2.1(a).

11.     Where an employer fails to keep and preserve the proper records, the Supreme

Court has established a burden-shifting approach for making determinations of fact concerning

wages paid and hours worked.  Under that approach,

> an employee has carried out his burden if he proves that he has in fact performed
> work for which he was improperly compensated and if he produces sufficient
> evidence to show the amount and extent of that work as a matter of just and
> reasonable inference.  The burden then shifts to the employer to come forward
> with evidence of the precise amount of work performed or with evidence  to
> negative the reasonableness of the inference to be drawn from the employee's
> evidence. If the employer fails to produce such evidence, the court may then
> award damages to the employee, even though the result be only approximate.

*Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687-88 (1946).  The employee may satisfy

his or her burden by relying solely on recollection.  *Rivera v. Ndola Pharmacy Corp.*, 497 F.

Supp. 2d 381, 388 (E.D.N.Y. 2007) (*citing Doo Nam Yang v. ACBL Corp.*, 427 F. Supp. 2d 327,

335 (S.D.N.Y. 2005).  New York law imposes similar burden-shifting where an employer fails to

keep the required records.  N.Y. Lab. Law § 196-a.

12.     As the defendants here failed to maintain and produce proper records concerning

the hours worked by the plaintiff, and the wages she was paid, the court may, and does, rely on

the plaintiff's recollection as to those matters. Her recollection is corroborated by the testimony

of a co-worker. Her testimony, based on her recollection, is also internally consistent. The

plaintiff testified that her wages were $4.50 per hour at the outset, and that her wage was raised

to $5.00 per hour after some months. Elsewhere, she testified that she received $225 per week,

and that the amount went up to $250 per week. Those two amounts, when divided by $4.50 and

$5.00, respectively, both yield 50 hours. That number of hours approximates what the plaintiff

would have worked per week according to her testimony concerning the hours she worked on

weekdays and the hours she worked on weekends. Specifically, she testified that she worked

three weekdays for about 7-1/2 to 8 hours a day, and two weekend days for about 13 to 13-1/2

hours a day; when added together those hours total a roughly 50-hour workweek. The

defendants, on the other hand, produced inconsistent testimony concerning wages and hours,

much of which was impeached by the prior inconsistent statements made by the defendants'

witnesses during depositions. The court thus credits entirely the plaintiff's testimony concerning

wages and hours.

13.     The defendants breached their obligations under the FLSA with respect to the

payment of minimum wages and overtime wages, and the plaintiff is therefore entitled to

damages for those periods of time when she was employed by the defendants which are within

the three-year statute of limitations applicable to FLSA claims. As the plaintiff filed this action

on February 8, 2006, she is entitled to recover for unpaid minimum and overtime wages for work

performed from February 8, 2003 until her employment terminated on February 23, 2003.

Having consulted a calendar, the court takes judicial notice that February 8 is a Saturday. As a

result, the court concludes that the plaintiff worked two full weeks and one extra weekend within

-11-

the statute of limitations. Given that the plaintiff's workweek at that time was 48 hours, the FLSA required that the plaintiff receive a minimum wage of $5.15 per hour for 40 hours and an overtime wage of $7.725 per hour for 8 hours, for a total of $267.80 per week. For the extra weekend, on which the plaintiff worked approximately 23 hours, the FLSA required that the plaintiff receive a minimum wage of $5.15 per hour, for a total of $118.45. As the plaintiff received no payment of wages during the period from February 8 to 23, her unpaid wages under the FLSA total $654.05.

14.    Under the FLSA, employers found liable for unpaid wages are also liable for "an additional equal amount as liquidated damages," 29 U.S.C. § 216(b), unless they can demonstrate that they acted in good faith. *See Barfield v. N.Y. City Health and Hosps. Corp.*, 537 F.3d 132 (2d Cir. 2008). The defendants here have offered no evidence to establish a good faith basis for their failure to pay the above wages. Accordingly, the plaintiff is entitled to an additional $654.05 in liquidated damages.

15.    Because of the tip credit, the straight time wage rate for most of the plaintiff's employment – $4.50 per hour and later $5.00 per hour – satisfied the defendants' obligation under New York law with respect to the payment of minimum wages, at least with respect to those periods of time when the defendants paid wages to the plaintiff. For the three-week period in February 2001 when the plaintiff was paid $3.00 per hour, the defendant were in violation of the minimum wage requirement of $3.30 per hour. Of course, for those periods when the plaintiff received no pay, the defendants were likewise in violation of New York's minimum wage laws. In addition, as the defendants never paid overtime wages to the plaintiff, they

breached their obligations under New York law with respect to the payment of overtime wages throughout the entire time of the plaintiff's employment.

16.      Having consulted a calendar, the court has determined that from August 2000 to February 8, 2003, the plaintiff worked a total of 130 weeks (21 in 2000, 52 in each of 2001 and 2002, and 5 in 2003).[3]  From August 2000 to February 2001, some 25 weeks, the plaintiff's wage rate was $4.50 per hour, and she was paid $225 per week.  For three weeks in February 2001, her wage rate was $3.00 per hour, and she was paid $150 per week.[4]  For the remaining 102 weeks, her wage rate was $5.00 per hour, and she was paid $250 per week (i.e., when her wages were actually paid.)

17.      Because the plaintiff worked different hours and was paid different wages at various times during her employment, the court calculates her unpaid wages separately for different periods of time.  As noted earlier, the plaintiff worked an average of 52 hours per week until December 2002, and thus worked an average of 12 overtime hours per week.  Looking first at the period from August 2000 to February 2001, if the plaintiff had been properly paid for the 12 overtime hours each week (i.e., $6.75 per hour), she should have received a total of $261 per week rather than $225 per week.  The unpaid overtime wages during that time thus amounted to $36 per week for 25 weeks or $900.

---

[3]The defendants were in breach of their wage obligations under New York law through the end of the plaintiff's employment on February 23, 2003.  Because the plaintiff is obtaining recovery of minimum and overtime wages under the FLSA for the period from February 8 to 23, 2003 the court does not award a second recovery of minimum and overtime wages under New York law for that period of time.

[4]Although no direct testimony was given concerning the total wages received during this three-week period, the court reaches this conclusion based on the inference drawn from the plaintiff's testimony that she was paid each week for 50 hours of work at straight time rates.

18.     For the three weeks in February 2001 when the plaintiff was paid at the rate of $3.00 per hour, she should have been paid at least $3.30 per hour for the first forty hours and $4.95 per hour (1.5 x $3.30) for overtime hours.  She thus should have received $191.40 each week rather than the $150 per week that she was paid.  Her unpaid wages for that period of time thus amounted to a total of $124.20 (3 x $41.40).

19.     From late February 2001 through November 2002, some 92 weeks, the plaintiff worked an average of 52 hours per week.  Had the plaintiff had been properly paid for the 12 overtime hours each week (i.e., $7.50 per hour), she should have received $290 per week rather than the $250 per week that she was paid.  As noted above, there were times during that period of the plaintiff's employment when she failed to receive any wages at all.  Although the defendants eventually made up some of the arrearage, there remained unpaid an arrearage of some six months  – or 26 weeks – for work done during that 92-week period.   The defendants' liability for unpaid wages for those 26 weeks thus amounts to $7,540 (26 x $290).   For the remaining 66 weeks of that time, the defendants' liability for unpaid wages amounted to $40 per week ($290 - $250) or $2,640.

20.     For the final ten weeks up to February 8, 2003, the plaintiff's work week averaged 48 hours.  If the plaintiff had received overtime pay for the 8 overtime hours each week, she should have received $260 per week.  In December 2002, when she was paid her weekly wage of $250, the weekly shortfall was thus $10. For the final five weeks in January and early February 2003, the plaintiff received no wages at all and the weekly shortfall was thus $260.  The total shortfall for those ten weeks thus comes to $1,350 (5 x $10 plus 5 x $260).

21.    The calculation of unpaid wages, including overtime wages, under New York law is set forth in a Schedule annexed to this decision.  The total unpaid wages comes to $12,554.20.

22.    Under the "spread of hours" provision of New York law, the plaintiff is also entitled to an additional one hour of pay at the applicable minimum wage for each day when she worked more than ten hours.  From August 2000 to December 2002, she worked more than ten hours on each of the two weekend days, and from December 2002 until February 23, 2003 – 12 weeks – she worked more than ten hours on one weekend day.  She is thus entitled to the following extra pay:  50 hours at $4.50 per hour (25 weeks from August 2000 to February 2001), or $225; 6 hours at $3.30 per hour (3 weeks in February 2001), or  $19.80; and 196 hours at $5.00 per hour, or $980.  The total for this item of unpaid wages comes to $1,224.80.

23.    Finally, the plaintiff is entitled to compensation for the $23 which was unlawfully withheld from her weekly wages for "tip tax."  The withholding began in February 2002 and continued until the plaintiff's employment ended a year later.  However, the plaintiff did not receive her weekly wages for some 33 weeks during that period, and therefore did not suffer withholding of the "tip tax" in those weeks.  She is entitled, however, to recover the unlawfully withheld monies for the 19 remaining weeks, a total of $437.

24.    The total of all unpaid wages due under New York law comes to $14,216.00.  In addition, under New York law an employer must pay an additional 25% of wages owed if the failure to pay was willful.  N.Y. Lab. Law §§ 198(1-a), 663(1).  As the court has determined that the defendants were aware of their obligations with respect to wages, and thus knowingly failed to honor those obligations, willfulness is shown.  Accordingly the defendants are liable for an additional $3,554.00 in damages, bringing the total damages under New York law to $17,770.00.

25.     The court rejects the plaintiff's argument that she is entitled to an award of

liquidated damages under state law for the period from February 8 to 23, 2003 in addition to the

liquidated damages afforded under the FLSA for that period.  The plaintiff has cited no case,

however, that has awarded a double recovery of liquidated damages under both federal and state

law with respect to the same unpaid wages.  For example, in *Chan* the court was careful to award

liquidated damages under state law only with respect to those items of damages, such as "spread

of hours" wages, for which no remedy was afforded under the FLSA.  *See Chan*,  2007 WL

313483, at *28-29.  The plaintiff nevertheless argues that a double recovery of liquidated

damages under both federal and state law should be made because the FLSA award of liquidated

damages is compensatory, whereas the state's award of liquidated damages is punitive.

Regardless of the purpose, the award under the FLSA is four times the award under state law,

and thus is more than sufficient to satisfy any punitive purpose the state law is intended to serve.

26.     The plaintiff is entitled to an award of prejudgment interest under state law for

that portion of unpaid wages for which she is being compensated under state law.  *See* N.Y.

C.P.L.R. § 5001; *Reilly v. Natwest Markets Group Inc.*, 181 F.3d 253, 265 (2d Cir. 1999).

Where, as here, the damages were incurred at various times the interest may be computed

separate on each item of damages from the date that item was incurred or on all of the damages

from a reasonable intermediate date.  N.Y. C.P.L.R. § 5001(b).  The latter approach is the only

one that may be employed here because of the lack of specificity about the date when many of

the damages were incurred.  Since the bulk of the damages arose in the period from February

2001 to December 2002 when the plaintiff failed to receive any weekly wages on a number of

occasions, the midpoint of that period, January 1, 2002, is the date from which prejudgment

interest should be calculated.  The rate of interest is set by New York law at 9% per annum.

N.Y. C.P.L.R. § 5004.  The amount upon which prejudgment interest is to be calculated is

$14,216.[5]

## CONCLUSION

For the foregoing reasons, the plaintiff is entitled to judgment against the defendants

Pacific House, Inc. and Eun Sook Ahn for the following amounts:

1.    Unpaid minimum and overtime wages under the FLSA in the amount of $654.05;

2.    Liquidated damages under the FLSA in the amount of $654.05;

3.    Unpaid minimum and overtime wages under state law in the amount of $12,554.20;

4.    Unpaid "spread of hours" wages under state law in the amount of $1,224.80;

5.    Unpaid wages due to the withholding of "tip tax" in the amount of $437.00;

6.    Liquidated damages under state law in the amount of $3,554.00;

7.    Prejudgment interest at the rate of 9% per annum calculated from January 1, 2002 to the date of judgment on the total unpaid wages under state law of $14,216.00.

The clerk of the court shall enter judgment accordingly.  In addition, it appears that the plaintiff

is entitled to an award of attorneys' fees and costs as those are available under both federal and

---

[5]The plaintiff acknowledges that, because liquidated damages under the FLSA are meant in part to compensate for the delay in obtaining wages, prejudgment interest is not available for the wages recovered under the FLSA.  Pl. Pre-Trial Mem., p.24.

state law for the claims here.  Any motion for such an award must be made within the time

prescribed by the Federal Rules of Civil Procedure.

**SO ORDERED:**

*Viktor V. Pohorelsky*

VIKTOR V. POHORELSKY
United States Magistrate Judge

Dated: Brooklyn, New York
       August 24, 2009

**SCHEDULE OF UNPAID MINIMUM AND OVERTIME WAGES IN VIOLATION OF NEW YORK LAW: AUGUST 2000 TO FEBRUARY 8, 2003**

| Time Period (number of weeks) | Hourly Wage Rate | Weekly Hours Worked (Avg.) | Weekly Pay | Lawful Weekly Pay | Weekly Shortfall | Total Shortfall |
|---|---|---|---|---|---|---|
| Aug 2000 to Feb 2001 (25 weeks) | $4.50 | 52 | $225 | $261 | $36 | $900.00 |
| Feb 2001 (3 weeks) | $3.00 | 52 | $150 | $191.40 | $41.40 | $124.20 |
| Feb 2001 to Dec 2002 (92 weeks) | | | | | | |
|    26 weeks no wages | $5.00 | 52 | $0 | $290 | $290 | $7,540.00 |
|    66 weeks | $5.00 | 52 | $250 | $290 | $40 | $2,640.00 |
| Dec 2002 (5 weeks) | $5.00 | 48 | $250 | $260 | $10 | $50.00 |
| Jan 2003 to Feb 8, 2003 (5 weeks) | $5.00 | 48 | 0 | $260 | $260 | $1,300.00 |

**TOTAL UNPAID MINIMUM AND OVERTIME WAGES**     **$12,554.20**